DEREK S. BENTSEN (Cal. Bar No. 232550)
Email:  bentsend@sec.gov
GINA M JOYCE (Cal. Bar No. 143233)
Email:  joyceg@sec.gov
RYAN FARNEY
Email:  farneyr@sec.gov
NINA B. FINSTON
Email:  finstonn@sec.gov
100 F. Street, NE
Washington, DC 20549
Telephone: (202) 551-6426 (Bentsen)
Facsimile:  (202) 772-9282 (Bentsen)

LOCAL COUNSEL
GARY Y. LEUNG (Cal Bar. No. 302928)
Email: leungg@sec.gov
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

Attorneys for the Plaintiff
Securities and Exchange Commission

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>       vs.<br><br>Curative Biosciences, Inc. f/k/a/ Healthient, Inc.,<br>William M. Alverson,<br>Katherine West Alverson, and<br>Steven G. Patton,<br><br>            Defendants, and<br><br>Katherine West Alverson,<br>Northeast Capital Group, LLC, and<br>Panacea Holdings Inc.<br><br>            Relief Defendants. | Case No. 18-cv-925-SVW-E<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)] and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a)].

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant Steven G. Patton resides in this district.

## SUMMARY

4.     Curative Biosciences, Inc. f/k/a Healthient, Inc. (the "Company"), William M. Alverson ("Alverson") the Chairman of the Board, and Katherine West Alverson ("West") the President and Chief Executive Officer (collectively "the Alversons"), made materially false and misleading statements to the investing public in the Company's 2013 Forms 10-K and 10-K/A (collectively "2013 10-Ks") to conceal their unregistered sale of more than 33 million shares of the Company's stock, the bulk of the proceeds of which they paid to themselves.  Alverson and West planned to divert millions of shares of stock to a business acquaintance, Steven G. Patton ("Patton"), disguised in the Company's public filings as payment for consulting services much of which Patton never performed and as payment to a

Patton-controlled entity, Surfside Partners, Inc. ("Surfside"), to pay a claim that was much smaller than the value of the shares issued to that entity. Pursuant to the plan, Alverson directed Patton to sell all of the shares the Company issued to him and entities controlled by him, keep a small payment for himself, and divert the bulk of the proceeds back to Alverson and West, via Northeast Capital Group, LLC ("Northeast Capital") and/or Panacea Holdings Inc. ("Panacea"), two entities controlled by Alverson and/or West. The Alversons used the approximately $4 million in diverted proceeds for personal expenses such as country club fees, retail purchases, restaurant tabs, and spas, and some business expenses.

5.     In the 2013 10-Ks filed with the SEC in September and October 2013, the Company, Alverson, and West informed the investing public that the Company had previously registered and issued 20.5 million shares pursuant to an equity compensation plan (the "Plan") registered using the Form S-8 registration statement ("S-8 shares") and issued for services. Contrary to these representations, the Company, Alverson, and West authorized and issued 17.23 million shares to Patton who only provided negligible services to the Company; Alverson, or Patton at his direction, sold the shares to the investing public; and Patton routed the bulk of the proceeds to Northeast Capital at the direction of Alverson. Patton wired more than $2 million from the sale of these shares to Northeast Capital.

6.     The Company, Alverson, and West also stated in the 2013 10-Ks that, with approval of a reviewing court, the Company authorized the issuance of 19.1 million shares of common stock pursuant to Section 3(a)(10) of the Securities Act [15 U.S.C. § 77c(a)(10)] to discharge $95,500 in claims against the Company that had been purchased by a "third party and a non-party to the legal action against the Company." The so-called "third party" was Patton's entity, Surfside. Contrary to these representations, the Company, Alverson, and West authorized and issued shares worth 18 times the amount of pending claim to Surfside. Alverson maintained control over all of these shares and sold or directed Patton to sell the shares. Patton

returned the bulk of the proceeds to Northeast Capital and Panacea.  Patton wired more than $1.9 million from the sale of these shares back to Northeast Capital and Panacea.

7.     Additionally, from May through August 2013, the Company, Alverson and West -- through Patton -- sold approximately 7 million purported Section 3(a)(10) shares to the public without a registration statement in effect.  Section 3(a)(10) requires that the "terms and conditions" of the issuance be disclosed to the reviewing court.  The Company, Alverson and West failed to disclose to the reviewing court the true terms and conditions of the issuance involving Patton.  Accordingly, the exemption did not apply.

8.     The Company, Alverson, and West directly or indirectly violated the anti-fraud and registration provisions and Patton violated the registration provisions of the federal securities laws.  The SEC requests, among other things, that the Court: (1) enjoin the Company, Alverson, West, and Patton from further violating the federal securities laws as alleged in this complaint; (2) prohibit Alverson and West, directly or indirectly, from participating in the issuance, purchase, offer or sale of any security other than the purchase or sale of securities on a national securities exchange for their  personal accounts; (3) prohibit Alverson, West, and Patton from participating in the offer or sale of penny stock; (4) prohibit Alverson and West from serving as officers or directors of a public company; (5) order the Company, Alverson, West, Patton, Northeast Capital, and Panacea to pay disgorgement and prejudgment interest; and (6) order the Company, Alverson, and West to pay a monetary penalty based upon these violations.

## **DEFENDANTS**

9.     **Curative Biosciences, Inc. f/k/a Healthient, Inc.** was incorporated in California in 1996 as Renet Services, Inc. and reincorporated in 2000 in Nevada under the name Time Lending, California, Inc.  The Company subsequently changed its name to Time Associates, Inc. in 2009; to Healthient, Inc. in 2010; to

SnackHealthy, Inc. in 2013; to Amaize Beverage Corp. in 2015; and to Curative Biosciences, Inc. in 2017. The Company was headquartered in Jupiter, Florida during the period October 2010 through January 2014 and in Newport Beach, California during the period January 2014 through at least October 2014. The Company is now located in Miami, Florida. During the relevant period, the Company purportedly was in the business of developing and marketing snack food products. The Company's common stock was quoted on the OTC Bulletin Board under the symbol "SNAX." The Alversons collectively and/or Alverson or West individually owned a majority of the Company's shares in the Company's fiscal years 2012 through 2014. During the relevant period, the Company did not meet the requirements to register shares on Form S-8.

10. **William M. Alverson**, age 53, resides in Jupiter, Florida. During the relevant period up to the present, he has been married to Defendant West. During the period October 5, 2010 through January 28, 2014, Alverson served as Chairman of the Board of the Company. In January 2015, Alverson pleaded guilty to having engaged in illicit unregistered sales of securities of Company stock in violation of 15 U.S.C. §§ 77e. *U.S. v. William Alverson*, SA CR-14-97-JVS (C.D. Cal.). He was sentenced to six months imprisonment to be followed by two years of supervised release and a special assessment of $100. He was released from prison on July 28, 2017.

11. **Stephen G. Patton**, age 48, resides in Dana Point, California. Through the relevant time period up to the present, he has worked as a media advertising consultant. During the relevant period, Patton was the sole owner, officer, and director of two private companies, Charlie Don't Surf, Inc. ("CDS") and Surfside. During the relevant period, Patton made unregistered offers and sales of securities of the Company and wired the bulk of the proceeds back to the entities controlled by Alverson and/or West from locations in Malibu and Mission Viejo, California, amongst multiple other locations.

1   **DEFENDANT OR ALTERNATIVELY RELIEF DEFENDANT**

2       12.   **Katherine West Alverson**, age 48, resides in Jupiter, Florida.  During

3   the relevant period up to the present, she has been married to Defendant Alverson.

4   During the period October 5, 2010 through January 18, 2014, West was CEO,

5   President and a director of the Company and handled its day-to-day operations.  Since

6   January 28, 2014, West has served as Chairman of the Company.  Effective March 5,

7   2018, West also became Chief Operating Officer of the Company.

8                    **RELIEF DEFENDANTS**

9       13.   **Northeast Capital Group, LLC** is a Delaware limited liability

10  company formed in 2010 by West and controlled by West and/or Alverson during the

11  relevant period.  At all relevant times, West was the sole signatory on Northeast

12  Capital's bank account, to which Patton routed proceeds from the sale of Company

13  shares.

14      14.   **Panacea Holdings Inc**. is a Delaware limited liability company formed

15  in December 2011 and controlled by West and/or Alverson during the relevant

16  period.  At all relevant times, West was the sole signatory on Panacea's bank account,

17  to which Patton routed proceeds from the sale of Company shares.

18                    **RELATED ENTITIES**

19      15.   **Charlie Don't Surf, Inc.** was incorporated by Patton in Florida in 2011,

20  and maintained its principal place of business in Ft. Lauderdale, Florida.  Patton

21  voluntarily dissolved Charlie Don't Surf in December 2017.

22      16.   **Surfside Partners, Inc.** was incorporated by Patton in California in

23  April 2012 and dissolved by him in December 2012.  It maintained its principal place

24  of business in Malibu and Mission Viejo, California.  In December 2012, Patton

25  incorporated a new entity in the same name in Nevada with a principal place of

26  business in Henderson, Nevada.  The Nevada entity was dissolved in November

27  2017.

28

FIRST AMENDED COMPLAINT                    6

## FACTS

**Alverson and West Directed the Company to Issue More Than 33 Million Shares of Unregistered Securities to Themselves and Filed Materially False and Misleading Disclosures That Concealed the True Nature of Those Issuances**

17.     Alverson and West directed the Company to issue more than 33 million shares of the Company's common stock to themselves.  The Company, Alverson, and West told investors that the shares were issued to pay employees and consultants for services and as payment to a third-party to discharge claims against the Company. The Alversons had actually directed the Company to issue all 33 million shares to a business acquaintance, Patton, or his entity, Surfside.  Patton agreed in advance to accept the shares, allow Alverson to sell the shares or sell the shares himself at Alverson's direction, and wire the bulk of the proceeds to Northeast and Panacea, entities controlled by Alverson and/or West.  In this manner, Patton paid the Alversons approximately $4 million from the sale of these shares that the Alversons used for business and personal expenses.

18.     Between May and August 2013, the Company, Alverson, West, and Patton illegally sold more than 7 million shares of the Company's stock without a valid registration statement and pursuant to an improperly obtained Section 3(a)(10) exemption.

**1.     The Company, Alverson, and West Issued 17.23 Million Purported S-8 Shares to Patton With Negligible Services Being Rendered**

19.     A company required to make periodic filings with the SEC under either Section 13 or 15(d) of the Exchange Act [15 U.S.C. §§ 78m and 78o(d)] may use a Form S-8 registration statement to issue shares to employees and consultants pursuant to an employee benefit plan.

20.     S-8 shares may not be used in connection with the offer or sale of securities in a capital raising transaction or to directly or indirectly promote or

maintain a market for the registrant's securities.

21.     As of the first day of the Company's 2011 and 2012 fiscal years, July 1, 2010 and July 1, 2011, the Company did not have 300 shareholders of record.  Thus, its obligation to file periodic reports pursuant to Section 15(d) was suspended, and the Company was ineligible to file a Form S-8 registration statement to register an offering of Company shares during those fiscal years.

22.     In fiscal year 2011, the Company adopted the Plan and identified the Plan on the registration statement filed with the Commission pursuant to Form S-8. The Company purportedly registered 8,500,000 shares of its common stock pursuant to the Plan on the Form S-8 registration statement filed with the SEC.  The Company purportedly registered an additional 12,000,000 shares of its common stock on an amendment to Form S-8 registration statement filed with the SEC in January 2012.

23.     In or around March 2011, Alverson asked Patton whether he would be willing to perform internet marketing services for the Company.

24.     At a meeting in or around May 2011, attended by Alverson, West, and Patton, Alverson proposed that the Company would issue purported S-8 shares to Patton, but that the shares would remain subject to Alverson's control.  Alverson further explained that Patton would have to open a brokerage account at a firm designated by Alverson into which Patton was to deposit the S-8 shares and over which Patton was to grant Alverson trading authority. Alverson made clear that he would direct Patton when to sell the shares and/or sell the shares himself pursuant to his trading authority over the account.  Alverson further indicated that Patton would wire the bulk of the sales proceeds as directed by Alverson, and retain some portion of the proceeds as compensation for Patton's facilitating the sales.

25.     Patton agreed to the arrangement proposed by Alverson.

26.     In June 2011, at Alverson's direction, Patton opened a brokerage account in CDS's name with a Utah-based brokerage firm (the "brokerage firm") and allowed Alverson trading authority in that account.

27.     In or around June 2011, Alverson and/or West instructed the Company's then transfer agent, located in Nevada, to issue S-8 shares to Patton.

28.     Between July 1, 2011 and March 12, 2012, Alverson and West held four special meetings of the board of directors at which they were the only attendees. Subsequently, on August 6 and September 26, 2012, Alverson and West, as the only participating board members, generated unanimous written consents of the board. During these four meetings and in these two consents, Alverson and West authorized the issuance of 17.23million purported S-8 shares to Patton pursuant to Alverson's agreement with Patton.  Specifically, the minutes of the special meetings, which West signed, memorialized in writing that Alverson and West authorized shares to be issued to Patton "for services rendered to the [Company] pursuant to the [Company's] 2010 Equity Compensation Plan . . .  [which had] been registered on the registration statement on Form S-8."   The two unanimous written consents, which Alverson and West both signed, stated that Alverson and West authorized shares to be issued to Patton "for services rendered to the [Company] . . . pursuant to the [Company's] 2010 Equity Compensation Plan, as amended."

29.     West issued written instructions via email -- on Company letterhead and signed by her in her capacity as the Company's CEO and President -- to the Company's Utah-based transfer agent to issue a specified number of "S-8" shares in the name of Patton.  West also signed a standard representation letter required by the transfer agent before it would issue a stock certificate in which West represented that the shares were issued under the Company's 2010 Equity Compensation Plan registered on Form S-8 and filed with the SEC on November 9, 2010 or, as amended, January 10, 2012.  West also falsely claimed in the letter that "the shares issued were not in connection with the offer or sale of securities in a capital-raising transaction …. "

30.     As a result of the foregoing, the transfer agents issued 17.23 million purported S-8 shares to Patton which, following a reissuance of the certificates at

Patton's direction in the name of CDS, Patton deposited into the CDS brokerage account between June 2011 and October 2012.

31.    Although Patton began receiving shares in June 2011, from that time through the present, Patton performed negligible services.

32.    Beginning in late June 2011, and continuing through early October 2012, Alverson, or Patton at Alverson's direction, placed sell orders with the brokerage firm to sell all 17.23 million purported S-8 shares through the CDS brokerage account, generating gross illicit proceeds of $2,365,591.  Patton and Alverson placed sales calls from multiple locations including, in the case of Patton, from Malibu, California.

33.    Beginning in July 2011, and continuing through October 2012, from multiple locations, including Malibu, California, Patton, at Alverson's direction, wired cash from the CDS brokerage account, via a CDS bank account, to a Northeast Capital bank account.  West was the sole signatory on the Northeast Capital bank account.

34.    West, on behalf of Northeast Capital, sent Patton fake invoices that described services that Northeast Capital purportedly performed for CDS.  No such services were provided.  At or around the time of receiving each invoice, Patton wired the funds to Northeast Capital.

35.    Additionally, on September 2, 2011, the Alversons authorized the issuance of four million restricted shares to Patton ("the Restricted Shares") purportedly for $400,000 of services rendered.  Patton deposited the shares, which the Alversons directed be issued in CDS's name, into the CDS brokerage account. Patton had performed negligible services at that time, but represented to the brokerage firm that he had provided full consideration for the Restricted Shares by September 5, 2011.  Patton then sold the Restricted Shares prior to the running of the required holding period and directed the bulk of the proceeds to the Alversons in the same manner as with the purported S-8 shares.

36.     Patton, at Alverson's direction, wired $2,189,650 in net proceeds from the sale of the purported S-8 and Restricted Shares to Northeast Capital.  Patton retained approximately $128,000.

37.     Alverson and West used the cash wired from CDS for both Company and personal expenses including, but not limited to, country club dues, retail purchases, restaurant tabs, and spas.

## 2.     The Company, Alverson, and West Authorized the Company to Issue 19.1 Million Shares to Surfside

38.      Section 3(a)(10) of the Securities Act permits a company to issue common stock "in exchange for one or more bona fide outstanding securities, claims or property interests" without having to file a registration statement, "where the terms and conditions of such issuance and exchange are approved after a hearing upon the fairness of such terms and conditions" by any court.

39.     On April 5, 2012, an entity called Siesta Flow LLC obtained a judgment for breach of contract against the Company in the Twelfth Judicial Circuit Court in and for Sarasota County, Florida in the amount of $95,159.99.

40.     Alverson again approached Patton and proposed that a Patton-controlled entity buy the claim from Siesta Flow and two associated claims against the Company from attorneys for services rendered and, in turn, the Company would issue shares to the Patton-controlled entity in satisfaction of the claims.  Alverson then told Patton that the Patton-controlled entity would sell the shares and divert most of the proceeds to Alverson-controlled entities while retaining a portion as compensation for facilitating the sales.  Alverson made this proposal via telephone to Patton who was physically located in the Central District of California at the time Alverson placed and Patton took the call.

41.     Patton agreed to the proposal.

42.     Alverson told Patton that CDS could not be the entity to purchase the claims because Alverson wanted to avoid questions about CDS's status as a potential

affiliate of the Company.

43.     In April 2012, Patton incorporated Surfside in California to effectuate the transactions.

44.     On April 24, 2012, Surfside entered into an assignment of claims agreement which obligated it to pay a total of $95,500 in satisfaction of the claims: $75,000 to Siesta Flow; $16,000 to counsel who had defended the Company in the Siesta Flow litigation; and $4,500 to counsel who issued a legal opinion in connection with the settlement.  Accordingly, Surfside took assignment of the three claims against the Company.

45.     Also on April 24, 2012, West, in her corporate capacity, and Patton, on behalf of Surfside, signed a Share Issuance Agreement which called for the Company to issue 19.1 million shares to Surfside "for the relinquishment of the Claims" Surfside now held against the Company, subject to court approval.

46.     Alverson told Patton that Patton would retain beneficial interest in and control of two million of the 19.1 million shares to be issued to Surfside, and that Alverson would retain beneficial interest in and control of the remaining 17.1 million shares.

47.     On April 27, 2012, the Company filed a motion in the Sarasota County court for an order approving the settlement and assessing the fairness of the assignment of claims and share issuance.  In support of the motion, the Company submitted, among other documents, a copy of the Share Issuance Agreement and an opinion letter from an attorney advising that the share issuance complied with the requirements of Securities Act Section 3(a)(10).

48.     The Company failed to mention, in any of the documents that it filed with the Sarasota County court, the side agreement between Alverson and Patton pursuant to which Alverson retained ultimate control of the majority of the shares to be issued.  Further, no party to the proceeding informed the court of the side agreement.  Additionally, the Company falsely claimed in its paperwork to the court

that Surfside was not an affiliate of the Company, even though Patton had incorporated Surfside at Alverson's direction and was allowing Alverson to control the sale of the shares that would be issued.

49.     The court ultimately issued an order approving the settlement and stating that the issuance of the 19.1 million shares "would conform to the provisions of Section 3(a)(10)."

50.     At that time, the fair market value of the shares determined by multiplying the number of shares, 19.1 million, by the then per share market price, $.09, was approximately $1.7 million, or 18 times the value of the claims being settled.

51.     Surfside discharged the $95,500 settlement amount by making three separate payments, the last of which Patton made out in the amount of $16,000 on or about April 18, 2013, and which was drawn on Surfside's bank account on April 22, 2013.

52.     In October 2012, Patton opened a brokerage account in Surfside's name with the same brokerage firm with which CDS held its brokerage account.

53.     The Share Issuance Agreement provided that Surfside could not hold more than 9.99% of the issued and outstanding Company common stock at a given time.  As a result, Alverson and West directed the Company to issue the 19.1 million authorized Section 3(a)(10) shares incrementally.  During the eight months between October 2012 and June 2013, Alverson and West signed eleven unanimous written consents of the Company's board of directors in which they authorized the Company to issue a specified number of purported Section 3(a)(10) shares to Surfside.

54.     Each of the unanimous consents described the shares authorized as "Rule 3(a)10 [sic] Court Approved Issuance", and authorized the officers to take steps necessary to effectuate the transactions.

55.     Pursuant to that authority, West issued written instructions to the Company's transfer agent via email to issue stock certificates for a specified number

of shares to Surfside that were "Rule 3a-10 [sic] Court Approved." West issued the instructions on Company letterhead and signed them in her capacity as the Company's CEO and President.

56.     Pursuant to West's instructions, the transfer agent issued 12.95 million Company shares (of the 19.1 million Section 3(a)(10) shares authorized) to Surfside which Patton, acting on behalf of Surfside, deposited into Surfside's account with the brokerage firm.

57.     Beginning on November 7, 2012, and continuing through August 30, 2013, Alverson, or Patton at Alverson's direction, sold 11.88 million of the purported Section 3(a)(10) shares through the Surfside brokerage account, generating gross illicit proceeds of $2,206,153. Patton made sales calls to the brokerage firm from multiple locations including Malibu and Mission Viejo, California.

58.     Surfside held all 11.88 million shares for less than one year before Alverson and/or Patton sold them into the public market.

59.     During the same time period, Patton, at Alverson's direction, intermittently wired cash from the Surfside brokerage account, via a Surfside bank account, to bank accounts for Northeast Capital and Panacea over which West was the sole signatory.

60.     Patton ultimately wired $1.8 million to Northeast Capital's bank account and $43,210 to Panacea's bank account while retaining $139,363.95 for himself for executing the transactions.

61.     As before with the purported S-8 shares, West, on behalf of Northeast Capital, manufactured bogus invoices to Surfside stating that Northeast Capital had provided services to Surfside, which corresponded to some (though not all) of the cash that Patton wired to Northeast Capital's bank account.

62.     The first nine invoices, from November 14, 2012 through January 28, 2012, were all backdated and were sent by West via email on behalf of Northeast Capital to Patton on February 28, 2013, at which point in time the corresponding wire

1    transfers from Surfside had already taken place.

2         63.    Northeast Capital performed no services for Surfside.

3         64.    Alverson and West used the cash wired to Northeast Capital and Panacea

4    for both Company and personal expenses such as country club dues, retail purchases,

5    restaurant tabs, and spas.

6    **3.    The Company, Alverson, and West Made Materially False and
     Misleading Statements in the Company's 2013 10-Ks that Concealed**

7    **the Sale of 33 Million Unregistered Securities**

8

9         65.    On September 30, 2013, the Company filed a Form 10-K with the SEC

10   for its fiscal year ended June 30, 2013.  On October 1, 2013, the Company filed a

11   Form 10-K/A with the SEC for the same fiscal year.  Alverson signed each of these

12   filings in his capacity as a director of the Company.   West signed each of these

13   filings in her capacity as president and a director of the Company.  These 2013 10-Ks

14   contain materially false and misleading statements regarding the issuance, sale, and

15   disposition of purported S-8 and Section 3(a)(10) shares that the Company issued to

16   Patton and Surfside, respectively.

17   **a.    The 2013 10-Ks Are Materially False and Misleading As to the
     Purported S-8 Shares**

18

19        66.    The 2013 10-Ks describe the issuance of purported S-8 shares as

20   follows:

21        In fiscal year 2011, the Company adopted its 2010 Equity Compensation Plan

22        (the "Plan") which was registered on the registration statement on Form S-8.

23        The Company registered 8,500,000 shares of its common stock. The Plan was

24        amended in January 2012, and the Company registered an additional

25        12,000,000 shares of its common stock. . . . As of June 30, 2013, there were no

26        shares of common stock remaining for issuance under the Plan.

27        67.    This statement is false and misleading.  As described above, the Plan

28   required that shares be issued only "upon the completion of a specified period of

service, the occurrence of any event and/or the attainment of performance objectives."  Alverson and West knew, or were reckless in not knowing that 17.23 million of the 20.5 million purported S-8 shares, or 84% of the shares, had been issued to Patton under the guise of the Company compensating him for consulting services when, in fact, he had rendered no services or, as time passed, negligible services.  Further, Alverson and West knew, or were reckless in not knowing that Patton was a mere conduit to sell the shares at Alverson's direction and divert 94% of the proceeds to an entity controlled by Alverson and/or West and over whose bank account West was the sole signatory.

68.    This false statement was material.  Investors would want to know that 17.23 million shares, or 84%, of a 20.5 million share Plan distribution, were issued to Patton, who rendered negligible services to the Company and, instead, per agreement with Alverson, routed approximately $2 million, or 95%, of the gross proceeds from the sale of the shares to the Alversons, the proceeds of which the Alversons used to pay personal and Company expenses.

69.    Additionally, in Note 4 to the financial statements included in the 2013 10-Ks, the Company identified the number of shares it had issued "for services" in fiscal years 2011 through 2013, adjusted for a 50:1 reverse split that had occurred in October 2012.  Specifically, the 2013 10-Ks stated:  (1) during the 2011 fiscal year, "the Company issued 111,134 shares for services for $1,555,357"; (2) during the 2012 fiscal year, "the Company issued 1,225,008 common shares for services of $5,448,408"; and (3) during the 2013 fiscal year, "the Company issued 389,200 common shares for services of $166,200."  These shares issued "for services" included S-8 shares and restricted stock issued for services.

70.    Included in the foregoing disclosed shares are shares that the Company, Alverson, and West authorized and issued to Patton (17.23 million purported S-8 shares) and to CDS (four million Restricted Shares) for services rendered by Patton adjusted downward to account for the 50:1 reverse stock split in October 2012:

80,000 in fiscal year 2011; 240,000 in fiscal year 2012; and 104,000 in fiscal year 2013.  Thus, approximately 20% of the shares issued "for services" were issued to Patton.

71.     The statement in Note 4 relating to the number of shares issued "for services" is false and misleading because, as Alverson and West knew, or were reckless in not knowing, Patton rendered negligible services  up through the dates the 2013 10-Ks were filed.  Rather, Alverson and West also knew, or were reckless in not knowing, that the shares were issued pursuant to an agreement between Alverson and Patton.  By the time the 2013 10-Ks were filed, Alverson and West knew, or were reckless in not knowing that Patton had routed approximately $2 million, or 95%, of the gross proceeds from the sale of the shares to the Alversons.

72.     The false and misleading statement in Note 4 to the financial statements is material.  The investing public would want to know that approximately 20% of all shares that the Company issued purportedly "for services" were actually issued to Patton pursuant to a pre-arranged plan with Alverson for Patton to divert the bulk of the proceeds to Alverson and West, and that he had routed approximately $2 million, or 95%, of the gross proceeds from the sale of the shares to the Alversons.

**b.      The 2013 10-Ks Are Materially False and Misleading as to the Purported Section 3(a)(10) Shares**

73.     The 2013 10-Ks describe the issuance of the purported Section 3(a)(10) shares as follows:

> On April 27, 2012, the court issued an order to approve a settlement of the judgment against the Company.  According to the terms of the approved settlement, a third party and a non-party to the legal action against the Company, agreed to purchase the claim[s against the Company] . . . for a total amount of $95,500 in exchange for the issuance of 19,1000,00 shares of common stock by the Company.

74.     This statement is false and misleading.  Alverson and West knew, or

were reckless in not knowing, that Surfside, the recipient of the shares, was not a third party or a non-party.  Rather, each knew that Patton and, by extension, Surfside was an affiliate of the Company in these circumstances as each was always under the control of Alverson who directed Patton when to sell the shares and to wire the proceeds back to the Alversons.  Further, Alverson and West knew that Surfside did not need 19.1 million shares to discharge $95,500 in claims, and that almost $2 million of the proceeds of these shares were not used to discharge the claims, but were paid to them.

75.     Alverson also knew that the court order to which they refer in the 2013 10-Ks was improperly obtained as they failed to inform the court of the side agreement with Patton.

76.     The Company's, Alverson's, and West's false statements in the 2013 10-Ks regarding the purported Section 3(a)(10) shares were material.  Investors would want to know that Alverson and West had entered into a self-dealing transaction in which they agreed to settle a claim with themselves by paying Patton shares that were worth 18 times the value of the actual underlying judgment.  Further, investors would want to know that Alverson always controlled Patton and, by extension, Surfside and that Surfside was not a real third-party or non-party, but rather part of Alverson's plan to issue it significantly more shares than Surfside needed to discharge the claims so that the Alversons could enrich themselves with almost $2 million that the 2013 10-Ks never disclosed went to the Alversons.

**B.      The Sale of the Shares to the Public Was an Unregistered Sale of Securities**

77.     As described above, the issuance of the shares to Patton did not conform to the requirements of either Form S-8 or Section 3(a)(10).

78.     There was no registration statement in effect for any of the sales of the purported Form S-8, Restricted or Section 3(a)(10) shares.

79.     No exemption to the registration requirements apply to the sale of the

purported S-8, Restricted or Section 3(a)(10) shares.

80.     Within the five years preceding the filing of this action, the Company, Alverson, West, and Patton, directly or indirectly, made unregistered offers and sales to the public.

81.     Sales orders were placed via telephone calls to the Utah-based brokerage firm from outside of Utah, including from Malibu and Mission Viejo, California.

82.     The Company, Alverson, West, and Patton, directly or indirectly, made unregistered offers and sales to the public on the dates and in the amounts described below:

| Date of Sale | Number of Shares Sold | Proceeds of Sale |
|---|---|---|
| 5/30/2013 | 20,000 | $4,000 |
| 5/31/2013 | 280,000 | $48,450 |
| 6/3/2013 | 15,000 | $2,550 |
| 6/7/2013 | 89,424 | $13,681.87 |
| 6/10/2013 | 75,000 | $12,975 |
| 6/17/2013 | 100,000 | $15,930 |
| 6/25/2013 | 99,000 | $9,405 |
| 6/26/2013 | 450,000 | $44,100 |
| 7/1/2013 | 10,000 | $570 |
| 7/2/2013 | 120,000 | $4,320 |
| 7/8/2013 | 443,424 | $22,614.62 |
| 7/9/2013 | 99,000 | $5,950 |
| 7/10/2013 | 257,576 | $13,909.10 |
| 7/15/2013 | 251,184 | $13,940.71 |
| 7/16/2013 | 75,000 | $4,8000 |
| 7/17/2013 | 235,000 | $15,040 |
| 7/19/2013 | 66,000 | $4,455 |

| Date of Sale | Number of Shares Sold | Proceeds of Sale |
|---|---|---|
| 7/22/2013 | 18,750 | $1,293.75 |
| 7/23/2013 | 587,000 | $37,520.60 |
| 7/24/2013 | 267,066 | $16,558.09 |
| 7/29/2013 | 61,120 | $4,706.24 |
| 7/30/2013 | 457,163 | $35,903.39 |
| 7/31/2013 | 881,717 | $132,488.83 |
| 8/7/2013 | 273,700 | $27,233.15 |
| 8/8/2013 | 200,000 | $18,800 |
| 8/12/2013 | 162,000 | $16,011 |
| 8/13/2013 | 214,300 | $21,484.40 |
| 8/13/2013 | 435,696 | $46,782.73 |
| 8/14/2013 | 154,000 | $14,685 |
| 8/15/2013 | 109,000 | $12,605 |
| 8/22/2013 | 79,000 | $8,223 |
| 8/23/2013 | 50,000 | $4,800 |
| 8/27/2013 | 106,000 | $9,858 |
| 8/28/2013 | 66,304 | $6,497.79 |
| 8/28/2013 | 433,696 | $42,502.21 |
| 8/30/2013 | 4,685 | $398.23 |

83.    In the preceding five years before the filing of this action, the defendants sold 7,246,805 shares of Company stock to the public without a registration statement or Section 3(a)(10) exemption for a total of $738,242.

# FIRST CLAIM FOR RELIEF

## The Company, Alverson, and West Violated
## Section 10(b) of the Exchange Act and Rule 10b-5(b)

84.     The SEC realleges and incorporates by reference paragraphs 1 through 76 above.

85.     By filing false and misleading 2013 10-Ks as described above, the Company, Alverson, and West directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange  made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

86.     The Company, Alverson, and West acted knowingly or recklessly in connection with the above described false and misleading statements and omissions. Each knew based upon Alverson's side agreements with Patton and the execution of those agreements, or were reckless in not knowing, that the above-mentioned filings with the SEC contained material misstatements and omissions.

87.     By reason of the foregoing, the Company, Alverson, and West violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)].

# SECOND CLAIM FOR RELIEF

## Alverson and West Aided and Abetted the Company's Violations of
## Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(b)

88.     The SEC realleges and incorporates by reference paragraphs 1 through 76 above.

89.     By engaging in the conduct described above, the Company directly or indirectly, in connection with the purchase or sale of a security, by the use of any means or instrumentality of interstate commerce, of the mails, or of any facility or

any national securities exchange, knowingly or recklessly made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.     The Company violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b) [17 CFR § 240.10b-5(b)].

91.     By engaging in the conduct described above, Alverson and West knowingly or recklessly provided substantial assistance to the Company's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b) [17 CFR § 240.10b-5(b)].

92.     By reason of the foregoing, Alverson and West aided and abetted the Company's primary violations described above and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], are liable for such violations.

### THIRD CLAIM FOR RELIEF

**Alverson and West are Liable as Control Persons for the Company's Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(b)**

93.     The SEC realleges and incorporates by reference paragraphs 1 through 76 above.

94.     By engaging in the conduct described above, the Company violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b) [17 CFR § 240.10b-5].

95.     Alverson and West: (a) directly or indirectly controlled the Company; and (b) possessed the power and ability to control the Company as to its violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b)  [17 CFR § 240.10b-5].

96.     By reason of the foregoing, Alverson and West are liable as control persons pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] as to the Company's violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and

Exchange Act Rule 10b-5 [17 CFR § 240.10b-5].

## FOURTH CLAIM FOR RELIEF

### The Company, Alverson, West, and Patton Violated
### Sections 5(a) and 5(c) of the Securities Act

97.   The SEC realleges and incorporates by reference paragraphs 1 through 4, 7 through 18, 38 through 64, and 77 through 83 above.

98.   The Company, Alverson, West, and Patton by engaging in the conduct described above, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale without a valid registration statement or a valid exemption.

99.   The Company, Alverson, West, and Patton were necessary participants and substantial factors in unregistered offerings and sales of Company stock; Alverson and West authorized the Company to issue the shares and took the steps necessary to enable the unregistered offer and sale of the shares to the public via brokerage accounts that Patton established and maintained.  But for their conduct, the unregistered offerings of Company stock would not have occurred

100.   By reason of the foregoing, the Company, Alverson, West, and Patton violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & 77e(c)].

## FIFTH CLAIM FOR RELIEF

### Alverson, West, and Patton Aided and Abetted the Company's Violations of
### Sections 5(a) and 5(c) of the Securities Act

101.   The SEC realleges and incorporates by reference paragraphs 1 through 4, 7 through 18, 38 through 64, and 77 through 83 above.

102.   By the conduct described above, the Company violated Sections 5(a) and 5(c).

103.   By the conduct described above, Alverson, West, and Patton knowingly

and recklessly provided substantial assistance to, and thereby aided and abetted the Company's unregistered offer and sale of securities in its violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

104.   By reason of the foregoing, Patton aided and abetted Alverson's and West's primary violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)] described above and, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], is liable for such violations.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Judgment:

A. Permanently restraining and enjoining the Company, Alverson, and West from directly or indirectly violating (1) Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 pursuant to Section 21(d)(1) of the Exchange Act and (2) Section 5 of the Securities Act pursuant to Section 20(b) of the Securities Act.

B. Permanently restraining and enjoining Patton from directly or indirectly violating Securities Act Section 5.

C. Ordering the Company, Alverson, West (as a defendant or, alternatively, a relief defendant), Patton, Northeast Capital, and Panacea to disgorge all ill-gotten gains, with prejudgment interest, with disgorgement from the Company, Alverson, and West (in her capacity as a defendant) to be on a joint and several basis;

D. Imposing civil monetary penalties on the Company, Alverson, and West pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act;

E. Prohibiting Alverson and West each from directly or indirectly, including, but not limited to, through any entity owned or controlled by either defendant, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent either

defendant from purchasing or selling securities listed on a national securities exchange for their own personal accounts;

F. Prohibiting Alverson, West, and Patton from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(b)] and, in the case of Alverson and West, Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)];

G. Prohibiting Alverson and West each from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

H. Granting such other and additional relief as this Court may deem just and proper.

In accordance with Fed. R. Civ. P. 38 and C.D. Cal. L.R. 38-1, Plaintiff Securities and Exchange Commission hereby demands a jury trial on all issues so triable.

Dated:  June 8, 2018

*/s/ Derek S. Bentsen*

Derek S. Bentsen
Gary Y Leung (Local Counsel)
Gina M. Joyce
Ryan Farney
Attorneys for Plaintiff
Securities and Exchange Commission

Of Counsel:
Nina B. Finston

FIRST AMENDED COMPLAINT                25